IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 3, 2021

**STATE OF TENNESSEE v. ANWAR GHAZALI**

**Appeal from the Criminal Court for Shelby County**
**Nos. 18-03008, C1804328      W. Mark Ward, Judge**

_____

**No. W2019-02096-CCA-R3-CD**

_____

The Defendant, Anwar Ghazali, was convicted by a jury of second-degree murder and sentenced to twenty-two years imprisonment. See Tenn. Code Ann. § 39-13-210(a)(1). On appeal, the Defendant contends the evidence was insufficient to sustain his conviction based on the following: (1) the substantial two-day delay between the time of the alleged incident and the discovery of the body; (2) the State's failure to establish that the victim was missing during the two days; (3) and a lack of evidence proving the Defendant shot and killed the victim when the alleged incident occurred in an area where shootings were common. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Joseph A. McClusky (on appeal), and Blake D. Ballin (at trial), Memphis, Tennessee, for the appellant, Anwar Ghazali.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lora Fowler and Tracye Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On May 24, 2018, a Shelby County grand jury indicted the Defendant for first-degree murder. See Tenn. Code Ann. § 39-13-202. The Defendant proceeded to a jury trial, where the State adduced the following proof.

On the evening of March 29, 2018, the seventeen-year-old victim, Dorian Harris, visited the Top Stop Shop on Springdale Street in Memphis, Tennessee. The victim was described as a regular customer at the establishment. The Defendant was a store clerk at the Top Stop Shop and was working the register that evening.

Beverly Loverson was present at the Top Stop Shop that evening with her family. The family had gone inside the store, and after Ms. Loverson had competed her purchase, she returned to her van in the parking lot and waited on her son who was still inside. Ms. Loverson recalled that while waiting, she saw the victim come around the building and throw a plank at the exterior wall before entering the store. His behavior led her to believe he was angry, so she got out of her van to go back the store to get her family out of harm's way. She testified that while returning to the store, she watched the victim take two beers from the cooler and "slam" the door shut. According to Ms. Loverson, the victim ran out of the store and dropped one of the beers, and the Defendant picked up a gun from behind the counter and ran to the door. Ms. Loverson recalled that when the victim began to run, the Defendant "looked like he was going to shoot from behind the counter." Ms. Loverson testified that she told the Defendant "don't kill [the victim], it's just a beer."

Ms. Loverson testified that she went outside and watched the armed Defendant chase the victim while firing his weapon. She saw the Defendant leave the store property and run "to the corner of the yellow house" that was across from the store. Ms. Loverson indicated that the victim continued past the yellow house toward an adjacent vacant lot, and she assumed that the victim was cutting through that vacant lot, which she called the "cut." Ms. Loverson testified that she watched the Defendant fire the gun from the sidewalk of the yellow house shooting while aiming at "the cut." Mr. Loverson asserted that the Defendant shot "five or six times" and that she was close enough to the Defendant when he fired the gun that her "ears were ringing." According to Ms. Loverson, the Defendant was not aiming his weapon in the air but at the victim; there was no return fire; and the victim did not return to the store.

Ms. Loverson went back inside the store to get her family. She recalled that the Defendant walked back inside the store and said, "I think I hit [the victim's] a-s." The Defendant went back to the counter and continued to wait on customers. The Defendant's statement made Ms. Loverson believe that the victim had been shot. She testified that she got in her van and drove slowly down Springdale Street in an attempt to find the victim. She testified that it was dark and difficult to see at the time and that she did not see the victim or any movements. Afterwards, Ms. Loverson did not call the police because she thought the victim had gotten away or would get help if he had been shot.

Terrance Stevenson was also at the Top Stop Shop on the evening of March 29, 2018. Mr. Stevenson testified that he was waiting in line at the counter when the victim entered the store, slamming the door as he entered. Mr. Stevenson turned around when he heard the cooler door slam and saw that the victim had taken two beers. Mr. Stevenson

testified that the victim dropped one beer before running out of the door toward Howell Street, across from the store. Mr. Stevenson testified that the Defendant got a gun from behind the counter, pointed it at the victim, and said, "I'm fixing to get [the victim]." Mr. Stevenson went to the glass door to watch and could see the Defendant shooting the gun at the victim as he fleeing. Mr. Stevenson saw the Defendant run to the corner of the yellow house, but Mr. Stevenson could not see the Defendant after he got to that corner. Mr. Stevenson recalled hearing "three or four" gunshots. The Defendant came back inside the store where Mr. Stevenson watched him walk back behind the counter and recalled him saying, "I think I got [the victim]." The Defendant proceeded to unload the gun and put it back behind the counter. Mr. Stevenson testified that the Defendant's statement led him to believe that the victim had been shot, but Mr. Stevenson did not want to call the police because he did not want to get involved.

On the afternoon of March 31, 2018, Henry Pipkin and his wife, Beatrice Pipkin, had returned home from mowing. The Pipkins' home was located on Springdale Street and was three buildings down from the Top Stop Shop. The Pipkins were in their back yard when their daughter found blood on the patio and in the grass. Mr. Pipkin also observed blood on the patio concrete and followed a trail of blood around the side of his house. Mr. Pipkin noticed blood on the side of his house, and it looked like someone had "sprayed" blood on the window. He then found a red tennis shoe, and as he continued to follow the trail along his fence over to a vacant barber shop lot, he found the victim's body beside a tree on the other side of his fence.

Mrs. Pipkin called the police and testified that the body appeared to have been there for some time because the victim's body looked "stiff" and "swollen" and the blood on the victim's body and clothes was dry. At trial, both Mr. and Mrs. Pipkin recalled hearing about five gunshots on the evening of March 29, 2018, and said that it was common to hear gunshots in the neighborhood. Based upon his familiarity with the neighborhood, Mr. Pipkin indicated that he believed the shots were fired near the Top Stop Shop on that evening.

When the police arrived around 4:00 p.m., the officers observed dried blood on Mr. Pipkin's window and fence, a red shoe near the window where the blood was, and the victim's body next to the fence. The officers also found blood splatter on the vacant home beside the Pipkins' house. As officers secured the surrounding area, three shell casings were found at the intersection of Springdale Street and Howell Street across from the Top Stop Shop. The Top Stop Shop had a total of twenty-four security cameras and sixteen of them captured what happened at the shop on March 29, 2018 from several angles. Sam Alsoga, an employee from the Top Stop Shop, testified at trial that the Defendant called him on Saturday, March 31, 2018, to get the password to the surveillance footage, so that the police could access the videos. Mr. Alsoga also testified that the gun kept at the store was the store owner's personal gun, not the Defendant's.

The surveillance footage from the store's security cameras showed the victim throwing a plank at the exterior wall and then pushing the store's door open. At trial, both Mr. Alsoga and Ms. Loverson identified the Defendant in the video and testified that he was standing behind the cash register. The video showed the victim going to the cooler and getting two beers and then running out of the store and dropping one of the beers. Following this footage, Mr. Stevenson and Mr. Alsoga recognized the Defendant picking up a gun from behind the counter, pointing it at the victim, and then running out the door to chase him. In the video, the Defendant was seen standing outside of the store pointing the gun in the same direction that the victim was running.

On the afternoon of March 31, 2018, Ms. Loverson was traveling through the neighborhood when she saw the crime scene tape and police at the Pipkins' house. She testified that when she saw the crime scene tape, she said, "I'll bet that's the guy, the young man that got killed Thursday." Ms. Loverson stopped at the house and described to Mrs. Pipkin the clothing the victim was wearing when she last saw him at the Top Stop Shop; Mrs. Pipkin confirmed to Ms. Loverson that she observed similar clothing on the victim. Ms. Loverson testified that when she got to the Pipkins' house, she could see the Defendant standing outside smoking at the Top Stop Shop. She then proceeded to tell the detective, "[T]here's the young man standing there smoking a cigarette, he's responsible for this young man's death." Ms. Loverson provided police with a statement and identified the Defendant in a photo identification lineup.

The police took the Defendant to the police station to give a statement. The Defendant was given his Miranda warnings, and he voluntarily waived his rights and signed a waiver form. The Defendant indicated that he had been employed at the Top Stop Shop for two months and was working on the evening of March 29, 2018. In his statement, he said that he was waiting on customers when the victim walked into the store, slammed the cooler door, and took two beers from the cooler. The Defendant said that he grabbed the .40 caliber Glock from behind the store counter and proceeded to run after the victim. The Defendant claimed he went outside to see where the victim had gone, and after someone told him the victim went "that way," the Defendant aimed the gun "up" to fire warning shots. The Defendant averred that he only fired twice. The Defendant said that the victim did not stop, so he went back inside the store, put the gun back behind the counter, and did not make any statements to the customers. The Defendant said that he did not call the police because he did not "hit" the victim and that it was time for him to close the store.

Subsequent forensic testing by the Tennessee Bureau of Investigation revealed that the Hornady .40 caliber Smith and Wesson cartridge casings found near the Top Stop Shop were fired from the same Glock handgun that was found at the store. No bullets were recovered from the scene that matched the gun. In addition, the senior operator from the Emergency Communications Bureau testified that there were no emergency calls made on March 29, 2018, to Springdale Street in reference to either a theft or gunshots.

The victim's grandmother, Effie Peete, testified at trial that the victim lived with her and that her house was about five houses down from the Top Stop Shop. According to Ms. Peete, the last time she saw the victim was around 6:00 or 7:00 p.m. on the evening on Thursday, March 29, 2018, when the victim left to walk to his cousin's house, which was one street behind Ms. Peete's house. Ms. Peete further testified that she believed the victim was staying with his cousin that evening and the next, and therefore, she did not expect to see the victim again until sometime on Saturday, March 31, 2018. Ms. Peete was not notified that the victim never arrived at his cousin's house.

An autopsy was performed on the victim, and the cause of death was determined to be "a gunshot wound to the thigh." The death was classified as a homicide. The medical examiner testified that a bullet was not recovered from the body because the victim had an entrance and exit wound. The bullet entered the back of the victim's left thigh and exited from the front inner part of the left thigh, perforating the superficial artery. The medical examiner testified that a wound with such a "degree of injury" to the superficial artery could have caused bleeding so rapid that the victim could have died within several minutes, though the victim would have been able to run immediately after he was shot. The medical examiner also said that depending on the position of the leg and whether or not pressure was applied to the wound, the bleeding could have been "significantly stem[med]" for some time and taken longer for the victim to die from the wound. The medical examiner testified that the victim died sometime between when he was last seen on March 29, 2018, and twelve to eighteen hours before his body was found on March 31, 2018.

The medical examiner testified that the toxicology report revealed a presence of alcohol, amphetamine, and marijuana in the victim's system. However, the medical examiner indicated that the combination of the substances might have had a minor effect or no effect at all on the victim's behavior. The medical examiner testified that the level of alcohol in the victim's body was below the legal limit and that the amount of marijuana was consistent with recreational use. Additionally, the amount of amphetamine in the victim's body was within a therapeutic range for treatment of ADHD.

Vita Zalikov, a private investigator, testified for the defense. She said that she interviewed both Ms. Loverson and Mr. Stevenson. Ms. Zalikov testified that she interviewed Mr. Stevenson moments before he was called to testify on the day of the trial. She recalled that Mr. Stevenson told her he did not see the shooting and did not go outside of the store when the Defendant ran out of the store. Ms. Zalikov also recalled that Mr. Stevenson told her that the Defendant said, "I think I got [the victim,]" when he returned to the store.

Ms. Zalikov testified that she had visited the Top Stop Shop during both daytime and nighttime hours to take measurements. She testified that there was a distance of seventy-seven feet between where the Defendant started firing the gun and where the

victim turned and ran into "the cut." Ms. Zalikov testified that there was difficulty "seeing into the cut" from seventy-seven feet away.

Based upon the foregoing, the jury convicted the Defendant of second-degree murder as a lesser-included offense of first-degree murder. The Defendant was sentenced to twenty-two years' imprisonment. This timely appeal followed.

ANALYSIS

The Defendant contends that the evidence was insufficient to sustain his conviction for second-degree murder. Specifically, the Defendant contends that the evidence was insufficient because of a substantial two-day delay between the time of the alleged incident and the discovery of the body. The Defendant notes that gunshots were common in this neighborhood and that during the forty-eight-hour gap between the victim's fleeing the store and his body being found, the blood trail at the Pipkins' house to the victim's body went unnoticed in an open area. Additionally, the Defendant submits that the State failed to establish that the victim was missing during the two days, observing that no one reported the victim as missing. The Defendant further argues that there was a lack of evidence proving that it was the Defendant who shot and killed the victim, commenting that there was no proof that bullets from the Defendant's gun actually hit the victim and that the Defendant's statements to the Top Stop Shop's customers were merely "chest-puffing" rather than a sincere claim.

The State responds that the evidence was sufficient. The State argues that the evidence showed that the Defendant deliberately fired the gun at the victim and that he vocalized his intent to shoot the victim when he said he was "fixing to get [the victim]" as he ran out of the store. The State also contends that the evidence established that the victim was hit by one of the Defendant's shots because the Defendant indicated to both Ms. Loverson and Mr. Stevenson that he thought he hit the victim. Further, the State notes that the Defendant had reason to believe he hit the victim because he lied to police about shooting the gun three times in the air, he returned to the store after he fired the first shots, and he did not speak to any customers when he entered the store. The State concludes that the jurors could have rationally inferred that the Defendant lied because he knew he was guilty.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in

testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Second-degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)).

Based upon the evidence in the light most favorable to the State, the jury could have reasonably inferred that the Defendant knowingly killed the victim. Ms. Loverson testified that when the victim ran out of the store with a beer, the Defendant "looked like he was going to shoot from behind the counter." Ms. Loverson watched the Defendant run out of the store after the victim, and Mr. Stevenson recalled the Defendant's stating that he was "fixing to get" the victim as he pointed the gun at the victim. Ms. Loverson saw the Defendant fire the gun "five or six times" in the victim's direction, and Mr. Stevenson said that he heard "three or four" gunshots and watched the Defendant shoot the gun at the victim. After the Defendant shot at the victim and returned to the store, Ms. Loverson and Mr. Stevenson heard the Defendant say that he thought he hit the victim.

Additionally, the surveillance footage from the store's security cameras corroborated the witnesses' testimony, showing that the Defendant picked up a gun from

behind the counter and pointed it at the victim. The video footage then showed the Defendant running out of the store chasing the victim and pointing the gun in the same direction that the victim was running. Finally, the Defendant evidenced some consciousness of guilt by changing details of the relevant events in his police statement, which minimized the Defendant's actions and culpability in the victim's death.

Two days later, the victim's body was found at the Pipkins' home on Springdale Street just three buildings down from the Top Stop Shop. The victim's blood was found on Mr. and Mrs. Pipkin's house, window, and fence. The blood left a trail in their yard that led to the victim's body. The victim's blood was also found on the vacant house located beside the Pipkins' house. Mrs. Pipkin testified that the body appeared "stiff" and "swollen" and the blood covering the body appeared to be "dry." Thus, the victim's body had been there for some period of time. Further, Ms. Loverson confirmed the clothes the victim was wearing on the evening of March 29, 2018, matched the clothes on the victim's body when it was found on March 31, 2018.

Additionally, the police recovered three shell casings from the intersection of Springdale Street and Howell Street across from the Top Stop Shop. Forensic testing indicated that the cartridge casings recovered by police were fired from the gun kept behind the counter at the Top Stop Shop, the same gun the Defendant used. This court has held that pointing a gun at someone and discharging it is sufficient to sustain the "knowing" element of second-degree murder. See State v. Anthony Bayman, No. W2014-01537-CCA-R3-CD, 2015 WL 12978649, at *6 (Tenn. Crim. App. Aug. 17, 2015); State v. Randy Ray Ramsey, No. E2013-01951-CCA-R3-CD, 2014 WL 5481327, at *6-7 (Tenn. Crim. App. Oct. 29, 2014).

The medical examiner indicated that the victim died sometime between when he was last seen and twelve to eighteen hours before his body was found on March 31, 2018. Furthermore, the autopsy of the victim revealed that the cause of death was "a gunshot wound to the thigh," and the death was classified as a homicide. The medical examiner testified that a wound with such a "degree of injury" to the superficial artery could have caused bleeding so rapid that the victim could have died within several minutes without pressure being applied to the wound.

Though the victim was not reported missing, Ms. Peete explained that the victim was supposed to have been be staying with his cousin from Thursday, March 29th through Saturday, March 31st. Ms. Peete had given the victim permission to stay with his cousin and did not expect to see the victim until sometime on Saturday. Therefore, Ms. Peete had no reason to question where the victim was or if something had happened to the victim during that timeframe.

The jury was free to resolve any inconsistencies or gaps in the testimony in favor of the State. A rational juror could conclude that the evidence was sufficient beyond a

reasonable doubt that the Defendant, and not another unknown person, inflicted the fatal gunshot wound.  The Defendant's arguments to the contrary are without merit.

## CONCLUSION

Upon consideration of the foregoing and the record, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE